UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>JAMES CODY BRYANT,<br>Defendant. | NO. MJ26-618<br><br>UNITED STATES MEMORANDUM IN SUPPORT OF DETENTION ORDER |

## I. Introduction.

On October 2, 2026, the Honorable Brian A. Tsuchida issued an arrest warrant for James Cody Bryant stemming from a Criminal Complaint charging Conspiracy to Murder Persons in a Foreign Country, in violation of Title 18, United States Code, Section 956(a)(1) and (a)(2)(A). Dkt. 1. Bryant was arrested on October 6, 2026, and had an initial appearance later that day. Dkt. 6.

The government filed a Motion for Detention. Dkt. 8. After conducting its pretrial investigation, the Probation Office issued a Pretrial Services Report finding that Bryant presents a risk of flight and danger to the community and recommending that the Court enter a Detention Order. This memorandum sets forth the factual and legal reasons why this Court should follow that recommendation and enter a Detention Order.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**II. The Legal Standards.**

The Bail Reform Act provides a ***rebuttable presumption*** for detention in cases like the instant one, where a defendant is charged with an offense under 18 U.S.C. § 956(a). 18 U.S.C. § 3142(e)(3)(B). Where this statutory presumption applies, to be released, the defendant bears the burden of producing evidence to rebut the presumption, although the government retains the burden of persuasion. *United States v. Hir*, 517 F.3d 1081, 1086-87 (9th Cir. 2008).

The Bail Reform Act identifies four factors that a court should consider in analyzing a detention motion: "(1) the nature and circumstances of the offense charged …; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including [] the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, [and] criminal history . . .; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

The government may present evidence regarding these detention factors by way of evidentiary proffer sufficient to make the court aware of the defendant's role in the offense, the weight of the evidence against the defendant, and other relevant factors. *See, e.g. United States v. Salerno*, 481 U.S. 739, 743 (1987); *United States v. Winsor*, 785 F.2d 757 (9th Cir. 1986).

**III. Review of the Detention Factors.**

In addition to the statutory presumption for detention in this case, each of the statutory factors listed in § 3142(g) weighs in favor of pretrial detention. There is no combination of conditions that will reasonably ensure Bryant's presence at future court proceedings or the safety of the community. Therefore, a Detention Order is necessary and appropriate in this case.

//

//



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**A. The Nature and Circumstances of Bryant's Offense.**

The 41-page Complaint details the horrific nature of Bryant's offense. It does not get much more serious or dangerous for the community. Over a six-month period, Bryant was in daily communication over Discord with Canadian citizen Jesse Van Rootselaar.[1] Van Rootselaar was planning to commit a mass-murder attack and discussed the details with Bryant. With a full understanding of Van Rootselaar's intent, Bryant aided in the attack plot, becoming a conspirator in the murders. This culminated in the tragedy on February 10, 2026, when Van Rootselaar attacked the Tumbler Ridge Secondary School. During the attack, Van Rootselaar killed five children and one staff member and seriously injured others. Complaint at 4. Immediately prior, Van Rootselaar killed Van Rootselaar's mother and stepbrother at their home. *Id.*

Bryant played an important role in the conspiracy that led to these heartbreaking murders by aiding Van Rootselaar in various essential ways.

**1. Bryant's Agreement to Assist in the Livestream of the Attack.**

Bryant agreed to record Van Rootselaar's livestream of the murders and broadcast it over the internet for the public to view. Van Rootselaar repeatedly emphasized that broadcasting the livestream was an essential aspect of the conspiracy. Complaint at 21-28. For example, on January 21, 2026, Van Rootselaar told Bryant: "If you don't post it it won't work. … If I don't livestream it people can be detached from the gravity of how I feel. It's just another headline. I need people to see it and personally witness the lives be impacted." *Id.* at 27. Bryant assured Van Rootselaar: "I won't fail you." *Id.*

Similarly, on February 9, 2026, the day before the attack, Van Rootselaar stated: "If I don't have someone I know for certain is gonna be there [to livestream] I don't wanna do it." Complaint at 28. Bryant replied: "I literally fixed my sleep schedule to help me stay up to be there after work." *Id.* Later that day, Van Rootselaar again emphasized the importance of the livestream: "I really do beg that u at least give a sincere try at being

---

[1] According to the Royal Canadian Mounted Police, Van Rooselaar was an 18-year-old resident of Tumber Ridge, British Columbia. Van Rootselaar was born a male and had been transitioning. Van Rootselaar was identified as female on official Canadian Government identification documents and law enforcement reports.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

there for my final moments n manage to share them. I bought the whole camera holder thing n everything. I don't wanna be let down." *Id.* at 28. Bryant assured Van Rootselaar: "I will I'll be there." *Id.*

Bryant also assisted Van Rootselaar in testing the livestream equipment on multiple occasions to ensure the transmission would be strong and the camera would provide a viewing angle of the murders. Complaint at 21-22, 26. On these occasions, Bryant assured Van Rootselaar the transmission was coming through, it "looks solid," and "it works." *Id.*

After assisting with the test livestreams, Bryant made good on the promise to broadcast the livestream of the murders. Moments before the school attack, after Van Rootselaar killed family members and was sitting in a vehicle ready to drive to the school, Bryant and Van Rootselaar conferred about the livestream feed. Van Rootselaar started the feed and Bryant confirmed it was coming through. After about 20 seconds, the feed was cut off due to technical issues. Complaint at 39. But the livestream's failure was despite Bryant's best efforts to make it happen.

**2. Bryant's Provision of Monetary Support for the Attack.**

Bryant provided money to Van Rootselaar to purchase items for use during the attack, including the shoes that would be worn during the shooting, a lighter that would be used to ignite an explosive device, and stickers to decorate the firearms that would be used to commit the murders. Complaint at 12-21.

Bryant's agreement to send money for the lighter is most concerning. Van Rootselaar sent Bryant a photograph of the explosive device Van Rootselaar had constructed and intended to use during the school attack. Complaint at 20. Van Rootselaar explained the components of the device – including that a lighter would be used as the source of ignition – and how it would be deployed during the attack. *Id.* at 18-19. Among other things, Van Rootselaar said: "I bet this can make a whole room go up super quickly." *Id.* at 18. Bryant replied: "[S]ounds dangerous." *Id.* at 19. Van Rootselaar then asked Bryant for money to purchase the lighter. *Id.* Bryant immediately agreed and sent $14.33 to Van Rootselaar via PayPal. *Id.* The transaction was reversed because,


UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

unbeknownst to them, Van Rootselaar's PayPal account had been deactivated. *Id.* They then discussed alternative ways for Bryant to get Van Rootselaar the funds. *Id.* at 19-20.

Van Rootselaar ultimately deployed this explosive device during the attack at the Tumbler Ridge school, using it in the exact manner as had been described to Bryant. Complaint at 4, 21. Although $14.33 may not be a lot of money, it speaks volumes about the seriousness of the offense and the defendant's character that Bryant was willing to help purchase the ignition source for an explosive device that was to be used to attack schoolchildren.

**3. Conversations about Planning and Preparing for the Attack.**

Bryant and Van Rootselaar had numerous conversations about Van Rootselaar's planning and preparation for the murders, including discussing potential attack locations, the way the attack would unfold, and related topics. During some of these conversations, Bryant gave Van Rootselaar tactical advice regarding the carrying out of the attack, including that: "wide open spaces" are conducive to more casualties; Van Rootselaar should be armed with a handgun, among other weapons; and Van Rootselaar should make a functional suicide vest instead of a fake vest. Complaint at 8-12.

Moreover, in the moments prior to the school shooting, as Van Rootselaar was sitting in a family vehicle preparing to drive it to the Tumber Ridge school to carry out the murders, Bryant helped Van Rootselaar figure out how to start the car. Van Rootselaar, who did not know how to drive, was having trouble starting the push-to-start vehicle. Immediately after Bryant advised, "Button? Hold it a lil maybe," Van Rootselaar successfully started the car and proceeded to drive to the Tumbler Ridge school and commit the planned murders. Complaint at 39-40.

**B. The Weight of the Evidence Against Bryant.**

The evidence against Bryant is extremely strong. It consists primarily of Bryant's own words during the Discord conversations with Van Rootselaar, as extensively summarized in the Complaint. Bryant confirmed much of this same information during interviews with federal law enforcement agents. Complaint at 5-7.



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**C. Bryant's History and Characteristics.**

Although various aspects of Bryant's history and characteristics cut both ways on the detention analysis, on balance this factor weighs in favor of a Detention Order. In Bryant's favor are ties to the Western District of Washington and the lack of any criminal history. Bryant also has been employed at a fast-food restaurant, although it's not clear whether that job remains available due to the arrest in this case. Bryant previously told federal investigators that Bryant was on "thin ice" at work due to calling in sick often, and Bryant told the Probation Office that it was uncertain the job was still available after the arrest. Pretrial Services Report at 2.

But these factors are outweighed by other aspects of Bryant's history and characteristics, which call for pretrial detention. As noted by the Probation Office, there are mental health and substance abuse concerns here. Pretrial Services Report at 2-3. Of particular concern is that fact that Bryant was not honest with the Probation Office regarding the presence of suicidal ideations. Specifically, Bryant denied having any such thoughts "in the past couple of years." *Id.* at 3. But that is inconsistent with some of Bryant's statements to Van Rootselaar. For example, on August 27, 2025, Bryant stated: "I've just been constantly at the point where if juuust the right thing goes wrong I'll kill myself. For years. It's so exhausting." On January 12, 2026, Bryant stated: "Yeah, suicide is kinda easy if you really wanna die."

Moreover, the offense conduct in this case reveals deeply rooted aspects of Bryant's character that make it impossible for the Court to ensure the safety of the community if the Court were to order release. Bryant helped plan a mass murder over the course of several months. Up until the last moment, Bryant could have changed course and put a stop to this horrific crime. But Bryant chose not to intercede. Instead, Bryant moved forward with the agreement to assist Van Rootselaar in committing the murders.

Bryant repeatedly acknowledged being in a unique position to stop Van Rootselaar. For example, Bryant stated: "I know I can like, save lives I guess but idk. …trolly problem. I'd rather you not get snitched on." Complaint at 28. Similarly, Bryant


UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

told Van Rootselaar: "I might be the only one who can [stop you] at this point lol." *Id.* at 29. But all the way to the end, Bryant assured Van Rootselaar: "I still won't snitch." *Id.*

Although there were times when Bryant expressed disapproval of Van Rootselaar's attack plot, in particular as it related to targeting a school, and occasionally encouraged Van Rootselaar to consider delaying and/or not committing the attack (Complaint at 31-38), in the end Bryant followed through on the promise not to "snitch" on Van Rootselaar. Anyone whose character allows them to help plan a mass shooting and then sits back and (literally) tries to watch as schoolchildren are murdered, instead of "snitching" on the killer, is a danger to the community and should be detained pending trial.

**D. Seriousness of the Danger to the Community Posed by Bryant's Release.**

For all of the above reasons, Bryant's pre-trial release would pose a serious danger to the community. Moreover, one specific aspect of Bryant's offense conduct makes release particularly dangerous: Bryant's participation in the charged murder conspiracy took place primarily through online communications. As such, Bryant's future online behavior should be a primary concern for the Court. There are simply no conditions of release that can be fully and effectively enforced to ensure that Bryant does not pose a continuing threat to the community through online behavior. Considering the seriousness of the offense conduct in this case, releasing Bryant under these circumstances is too big of a risk to take with the safety of the community.

//

//

//



UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## IV. Conclusion.

For all the reasons set forth above, the government moves this Court to enter a Detention Order in this matter.

DATED this 13th day of October, 2026.

Respectfully submitted,

*s/ Todd Greenberg*
TODD GREENBERG
Assistant United States Attorney
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Phone: 206-553-2636
Fax: 206-553-4440
Email: Todd.Greenberg4@usdoj.gov